**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ELIAS FAMILY MANAGEMENT CO. LLC,** | : | |
| *Plaintiff*, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **APS CAPITAL CORP. et al.,** | : | **No. 14-5058** |
| *Defendants*. | : | |

PRATTER, J.                                                    FEBRUARY 8, 2016

**MEMORANDUM**

## I.    INTRODUCTION

Elias Family Management Co., LLC ("EFMC"), trading as Malta Street Partners, L.P., sues APS Capital Corp.,[1] American Physicians Service Group, Inc., and Proassurance Corp. (collectively "APS") for alleged conversion.  APS asserts the affirmative defense of release. EFMC and APS have both moved for summary judgment.  Essentially, EFMC alleges that APS unlawfully retained proceeds from bankruptcy trade claims that were owned by EFMC.  APS contends that a settlement agreement between the parties relating to litigation in Texas released APS from its obligation to distribute the proceeds to EFMC.

Because the settlement agreement from the Texas litigation is ambiguous as to the inclusion of the claims at issue in this case, a genuine dispute as to material facts remains and both motions for summary judgment will be denied.

---

[1]  APS Capital Corp. is one of several entities which operated under American Physicians Service Group, Inc.  APS Capital Corp. was the subsidiary which dealt in the bankruptcy trade claims discussed in detail below.

**II.    FACTUAL BACKGROUND**

EFMC is the successor in interest to Wholesale Realtors Supply Co. ("Wholesale").

Wholesale, which was principally directed by Gabriel Elias, engaged in a variety of investment

opportunities with tens of millions of dollars in assets.  APS was one of the investment brokers

Wholesale used.  Around 2008, when Mr. Elias began to show signs of dementia, his family

transferred his assets, including those invested with APS, to a trust company, and eventually put

them under the control of EFMC.  Upon review of Mr. Elias' assets, the family believed that

APS had been abusing its long-standing relationship with Mr. Elias and his diminished mental

capacity, selling him investments that were highly risky and speculative.

In December 2009, the Elias family filed a lawsuit (*Elias, et al. v. APS Financial Corp.,

et al.*, Case No. D-1-GN-004291) in Texas state court.  Shortly after the commencement of the

case, the parties agreed to stay the litigation and participate in an arbitration (*Elias, et al. v. APS

Financial Corp., et al.*, Case No. 10-01633).  During the course of discovery in the litigation and

arbitration, documents pertaining to bankruptcy trade claims sold from APS to Wholesale were

exchanged.  In 2011, the parties attended a mediation session and they reached a basic resolution

of the litigation.  On July 7, 2011 the parties entered into a "Confidential Settlement Agreement"

("Settlement Agreement").  Under the Settlement Agreement, APS agreed to pay the Elias

family a lump sum in exchange for a release of claims.

**A.    Terms of the Settlement Agreement**

Within the "Definitions" section of the Settlement Agreement, "Claims" are defined as

follows:

> "Claims" means and includes claims, rights, demands, debts, liabilities,
> complaints, allegations, damages, disputes, controversies, causes of action,
> matters, omissions, and requests for equitable, legal or administrative relief, of
> any and every kind or character, whether asserted or unasserted, liquidated or

unliquidated, accrued or unaccrued, mature or not yet mature, at law or in equity, whether in contract, in tort, or under statute, regulation, rule, ordinance, or other law, or under any other theory of any nature whatsoever, arising at any time, and relating or pertaining in any way to Claimants' investment accounts at APS Financial Corp. or business relationships with any of the Respondents.

Def.'s Br. Ex. 1, 1. Paragraph 2 in the "Agreements and Releases" section provides: "**Release of**

**Respondents.** In consideration of the Settlement Payment and other good and valuable

consideration, Claimants hereby unconditionally and irrevocably release, remise, acquit, and

forever discharge Respondents for any and all Claims." Id. at 3. Paragraph 4 deals with

unknown claims:

> **Waiver of Unknown Claims.** The releases contained in paragraphs 2 and 3 are to be construed as the broadest type of release. With respect to such releases, Claimants and Respondents expressly waive any and all actions, claims, demands and costs, rights or causes of action which exist as of the date this Agreement is fully executed, but of which Claimants or Respondents do not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect the decision to enter into this Agreement. It is expressly understood that no party shall ever assert any failure to disclose information on the part of another party prior to execution of this Agreement as a ground for challenging the validity of this Agreement.

Id. The Settlement Agreement also provides that the "[a]greement shall be construed, enforced

and governed under and in accordance with the laws of Texas." Id. at 5.

### B.      Trade Claims

The claims at issue in this case involve a type of investment known as a "trade claim."

Trade claims are essentially rights to payouts from bankruptcy estates. A creditor who is owed

money from a bankrupt party may sell to a third party the creditor's rights to collect from the

bankruptcy estate. Because payouts from a bankruptcy estate are uncertain, trade claims are sold

for a fraction of the potential payout. If trade claims are transferred after the filing of a proof of

claim with the bankruptcy court, the new holder of the trade claim may file a notice of transfer

with the bankruptcy court pursuant to Fed. R. Bankr. P. 3001(e).  However, such a filing is not

required, and many trade claims are transferred without the filing of a notice of transfer.

   Over the course of its relationship with APS, Wholesale purchased more than thirty

different trade claims from APS.[2]  Several distributions on trade claims purchased by Wholesale

appear to have been received by APS prior to the execution of the Settlement Agreement.

Internal counsel for APS at the time, specifically Mr. Lisenby and Ms. Blacklock, admitted to

being aware of one distribution of approximately $300,000 which was received in the weeks

leading up to the mediation.  Both Mr. Lisenby and Ms. Blacklock were surprised by the

distribution because they believed all of Wholesale's assets had been transferred away from

APS.  Although APS was aware that the distribution had been received and concluded that,

under the trade claim contract, it was obligated to forward the distribution to Wholesale, APS did

not forward the distribution, and it did not tell Wholesale about the receipt of the distribution.

   On 12 of the trade claims, distributions were received by APS during the time period

between the execution of the Settlement Agreement and the filing of this case.  Those are the

---

   [2]  While the language of each of the purchase and sale agreements differs to some extent, the relevant portion of one representative example reads:

   2.3 Distributions and Notices. Seller agrees to promptly forward to Buyer all notices and documents received from a Debtor, the Court or any third party with respect to the Claims assigned herein, to vote the Claims assigned herein in a timely manner and in accordance with Buyer's instructions and to take such further action with respect to the Claims in the Proceedings as Buyer may from time-to-time request. Seller further agrees that if Seller receives any distributions on account of the Claims whether in the form of cash, securities, instruments or any other property, the aforementioned shall constitute property of the Buyer to which the Buyer has an absolute right. Seller shall hold such property on behalf of it and in trust for Buyer and will at its own expense, deliver to Buyer any such property in the same form received (free of any withholding, setoff, claim or deduction of any kind) together with any inducements or documents necessary to transfer such property to Buyer within two (2) business days of receipt in the case of cash and five (5) business days in the case of securities.

Pl.'s Br. Ex. M.

trade claims underlying this action.[3]  As to those 12 trade claims, there was no notice of transfer filed with the bankruptcy court.  As a result, the distributions were paid out to APS.  APS has retained the distributions, which amounted to approximately $2,550,000 and 191,000 shares of Delta Air Lines stock, which have since been sold by APS.

In September 2011, Wholesale first learned of distributions made on the 12 trade claims. Wholesale then demanded that APS forward the distributions to Wholesale.  APS refused, referencing the Settlement Agreement as the reason it was entitled to keep the distributions. EFMC then filed this lawsuit.

## III.   LEGAL STANDARD

The standards by which a court decides a summary judgment motion do not change when the parties file cross-motions.  *Se. Pa. Transit Auth. v. Pa. Pub. Util. Comm'n*, 826 F. Supp. 1506, 1512 (E.D. Pa. 1993).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id*.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular

---

[3]  Some of the trade claims have still yet to produce any distributions.  On several trade claims, distributions were paid straight to Wholesale because a notice of transfer had theretofore been filed with the bankruptcy court.  Finally, Wholesale either abandoned or expressly sold some of the trade claims back to APS.  None of these trade claims are at issue in this lawsuit.

issue at trial, the moving party's initial burden can be met simply by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.  Under Rule 56, the Court must view the evidence presented in the motion in the light most favorable to the opposing party.  *Anderson*, 477 U.S. at 255.

## IV.  DISCUSSION

Wholesale alleges that APS has converted Wholesale's property in the form of the distributions on trade claims received after the parties executed the Settlement Agreement.[4]  APS counters by alleging that the Settlement Agreement unambiguously released all claims against APS, whenever arising, thus barring Wholesale's conversion claims.  To this point, Wholesale argues that the Settlement Agreement unambiguously fails to bar claims arising *after* execution of the agreement.  Wholesale also makes two arguments in the alternative: (1) the Court should reform the Settlement Agreement on the grounds of unilateral mistake so as to not bar Wholesale's claims;[5] and (2) because Wholesale held equitable title to the trade claims, it need not even bring a claim to recover its property from APS.[6]

---

[4]  Wholesale concedes that the Settlement Agreement precludes any potential claims as to the distributions received by APS prior to the execution of the Settlement Agreement. See Pl.'s Br. at 16 n.3 ("As noted elsewhere, Plaintiff makes no claim for distributions secured and retained by APS prior to the date of the Settlement Agreement").

[5]  Although the parties have discussed many of the facts that might form the basis for the Court to invoke principles of mutual or unilateral mistake under Texas law, the Court will not consider doing so at this juncture in light of the absence of an appropriate, pleaded-for remedy premised on such a theory.

[6]  In support of this theory, Wholesale cites to *Ferguson v. Ferguson*, 111 S.W.3d 589 (Tex. App. 2003).  In *Ferguson*, a surviving spouse was devised a marital home when her husband passed away.  *Id*. at 591.  The surviving spouse then brought a claim against her

A.        **Choice of Law**

Texas law applies to the interpretation of the Settlement Agreement.  This is because a

federal court exercising diversity jurisdiction applies the choice of law rules of the forum state.

*Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994).  Under Pennsylvania law,

courts will generally honor the intent of the contracting parties and enforce a negotiated choice

of law provision as long as the chosen state has a substantial relationship to the parties or

transaction, and the application of the law of the chosen state would not violate public policy.

*SKF USA Inc. v. Okkerse*, 922 F. Supp. 2d 432, 438 (E.D. Pa. 2014).  The Settlement

Agreement's choice of law provision clearly states that the agreement shall be construed under

Texas law.  Because APS and the referenced Texas litigation have substantial connections to

Texas, Texas law should be applied in the interpretation of the Settlement Agreement.

---

husband's estate arguing that certain property had been characterized wrongfully as separate rather than communal property.  *Id*. at 592.  The parties settled the matter and agreed that the surviving spouse would have "no further claim" against the estate.  *Id*.  Following the settlement, the estate wrote a letter to the surviving spouse requesting that she vacate the marital home.  *Id*. When she refused, the estate filed for a declaratory judgment and the surviving spouse counterclaimed for a declaratory judgment declaring her the owner of the marital home.  *Id*.  In reversing the trial court, which had ruled for the estate, the appellate court held that the surviving spouse acquired equitable title to the marital home as soon as her husband passed away.  *Id*. at 596.  The court further held that, even though the estate held the deed, giving the estate legal title, the surviving spouse "cannot reasonably be viewed as having a 'claim' against the estate." *Id*.  Rather, the claim for ownership of the property was being made by the estate.  *Id*.  Notably, in order to reach this decision, the court first had to determine that the parties had not intended the marital home to be included in their settlement of the initial lawsuit.  *Id*.

While Wholesale's situation appears arguably reminiscent to that of the surviving spouse in *Ferguson*, that case and outcome can be distinguished by the fact that the *Ferguson* court first determined that the parties did not intend to include the marital home within scope of the settlement agreement.  In this case, the Court does not find that the trade claims are outside the scope of the Settlement Agreement.  *Ferguson* also can be distinguished in that the estate initiated court proceedings in that case, whereas in this case, APS did not initiate the proceedings.  Consequently, *Ferguson* is distinguishable and Wholesale cannot prevail on its theory of holding equitable title with no need to bring a claim in order to be entitled to the distributions.

**B.       Interpretation of the Settlement Agreement**

Under Texas law, a release is a contract and should be interpreted like any other contract. *Kalyanaram v. Burck*, 225 S.W.3d 291, 297 (Tex. App. 2006).  The court must determine, as a matter of law, whether the release is ambiguous.  *Id*.  If the release is unambiguous, the court must enforce the release as written.  *Id*.  However, if a release is ambiguous such that it is subject to more than one reasonable interpretation, "then interpretation of the contract presents a fact issue for the jury."  *Id*.  *See also Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).  The court should construe the agreement "to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the parol evidence rule."  *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011).

When a court is presented with conflicting contract provisions, it should "attempt to harmonize the provisions, but must give effect to the entire agreement in doing so, assuming the parties intended every clause to have some effect."  *Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 347 (Tex. App. 2004).  If the court is unable to harmonize the provisions, and multiple interpretations are reasonable, the contract is ambiguous.  *Id*.  Finally, the court "need not embrace strained rules of construction that would avoid ambiguity at all costs."  *Leighton v. Rebeles*, 399 S.W.3d 721, 725 (Tex. App. 2013).

**i.       Text of the Settlement Agreement**

"In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls."  *Matagorda Cty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (quoting *City of Pinehurst v. Spooner Addition Water*

*Co.*, 432 S.W.2d 515, 518 (Tex. 1968)).  Thus, the Court will begin its analysis with the text of the Settlement Agreement.

Both parties argue that the Settlement Agreement unambiguously provides as they deem it to be, in their opposing preference.  Wholesale argues that the Settlement Agreement unambiguously fails to release any claims related to the distributions on the trade claims received after the execution of the agreement, while APS argues that the Settlement Agreement unambiguously releases all claims against APS, including any claims related to distributions on the bankruptcy trade claims that were received after the execution of the agreement.

Wholesale first argues that its claims related to the bankruptcy trade claims are not covered by the Settlement Agreement because the trade claims were not at issue in the Texas litigation.  Under Texas law, a release need not articulate every potential cause of action.  *D.R. Horton-Texas Ltd. v. Savannah Props. Assocs.*, 416 S.W.3d 217, 227 (Tex. App. 2013).  Instead, a claim is considered released if it is "mentioned" in the language of the release.  *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, 20 S.W.3d 692, 698-99 (Tex. 2000).  APS cites several cases in which Texas courts have held that seemingly unrelated claims are released by broad release language.  *Keck*, 20 S.W.3d at 698 (holding that release language barring all claims relating to legal services for a set period of time applied to claim for legal malpractice when original lawsuit was for unpaid fees); *Mem'l Med. Ctr. Of E. Tex. v. Keszler*, 943 S.W.2d 433, 434 (Tex. 1997) (holding that a doctor's claims against a hospital for exposure to ethylene oxide gas were released by broad release language in a settlement agreement in a lawsuit in which the doctor sued the hospital for revoking his staff and clinical privileges); *D.R. Horton*, 416 S.W.3d at 227-29 (holding that claims related to a home builder's failure to prepare soil

were barred by a broad release in a contract dispute case between a property developer and the home builder regarding the purchase of lots).

In this case, the parties decided to define "Claims" in the Settlement Agreement to include anything "relating or pertaining in any way to Claimants' investment accounts at APS Financial Corp. or business relationships with any of the Respondents." This satisfies the requirement that Wholesale's claims regarding the bankruptcy trade claims are "mentioned" in the release. This conclusion, however, does not dictate whether Wholesale's claims arising after the date of the execution of the Settlement Agreement were released.

Both parties argue that certain clauses within the Settlement Agreement establish unambiguously that the agreement releases (from APS's perspective) or fails to release (from Wholesale's perspective) Wholesale's claims in this matter. APS points to the definition of "Claims" which includes the language, "asserted or unasserted, liquidated or unliquidated, accrued or unaccrued, mature or not yet mature" and "arising at any time." Thus, even if the claims in this case arose when the distributions were paid to APS, the release still bars those claims. Wholesale argues, on the other hand, that Paragraph 4 of the Settlement Agreement clarifies the scope of the releases as they relate to unknown claims. Because the paragraph limits the express waiver of all claims to those "which exist as of the date this Agreement is fully executed," Wholesale's claims for conversion, which did not exist until the distributions were received by APS, were not released as part of the Settlement Agreement.

APS cites to two cases, one of which is unreported, in support of its position that Texas courts allow a release to bar future claims notwithstanding language limiting the claims released to those that exist as of the time of settlement. *See D.R. Horton*, 416 S.W.3d at 227; *Garza v. Bunting*, No. 05-06-01307-CV, 2007 WL 1545937, at *8 (Tex. App. May 30, 2007). In *D.R.*

*Horton*, the court affirmed summary judgment in favor of the defendant on claims which arose after the execution of a release when the release included the language, "as of the Effective Date." 416 S.W.3d at 227. Notably, however, the plaintiffs in *D.R. Horton* did not dispute whether their claims fell within the scope of the paragraph of the release which included that language. *Id.* Thus, the court did not discuss the effect of the phrase, "as of the Effective Date," on whether future claims were covered by the release. *Id.* at 227-28. In *Garza*, APS correctly points out that the release language in the settlement agreement included the phrase "now existing," and that the court still stated that "the mutual release is clearly intended to release any claims, known or unknown, existing now or in the future." 2007 WL 1545937 at *8. However, the counterclaims that the court deemed released in *Garza* were actually claims that arose before the execution of the settlement agreement and the court specifically stated, "[i]f Garza determined problems existed with the property upon termination of the lease, which was June 7, 2005, he still could pursue such claims *to the extent they arose after the date of the Agreement*." *Id.* at *6 (emphasis added). Consequently, these cases are distinguishable from the matter at hand and cannot resolve the potential ambiguity in the Settlement Agreement.

### ii.    Extrinsic Evidence

While the parol evidence rule "precludes the enforcement of prior or contemporaneous agreements[,] [t]he rule does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Houston Exploration Co.*, 352 S.W.3d at 469. With this in mind, each party points out extrinsic circumstances which support its argument as to the intent of the parties in executing the Settlement Agreement.

APS argues that three facts support its interpretation that the Settlement Agreement bars the claims in this case. First, APS Capital Corp.'s only dealings with the Elias entities related to

trade claims.  Thus, because APS Capital Corp. was named as a defendant in the Texas litigation, Wholesale was aware of the trade claims and knew that they were at issue in the Texas litigation. Second, documents relating to the trade claims, including the sale contracts, were produced in the Texas litigation, so Wholesale cannot claim it was unaware of the trade claims and their involvement in the Texas litigation.  Third, members of the Elias family admitted that the trade claims had been carefully evaluated over several years leading up to the Texas litigation with the help of financial advisors.  These arguments, however, pertain to whether the trade claims generally come within the scope of the release rather than whether the release includes claims which arose after the date of execution.

Wholesale cites deposition testimony elicited from APS's in-house lawyers suggesting that their discussions with the CEO about the amount to be paid in the Settlement Agreement did not mention any possible future distributions on the trade claims that would offset the amount paid under the Agreement.  Therefore, APS could not have possibly intended to receive the trade claims or rights to future distributions on those trade claims because there would have been some discussion regarding their potential future value when discussing the overall Settlement Agreement payment.  Wholesale also cites deposition testimony from members of the Elias family who stated their subjective understandings of what was encompassed within the Settlement Agreement.  However, in determining intent, the court should not give weight to subjective testimony about "what the parties allegedly meant."  *D.R. Horton*, 416 S.W.3d at 226.

Unfortunately, none of the arguments put forth by the parties sufficiently clarify the ambiguity in the Settlement Agreement.  The agreement at one point defines claims as "arising at any time," while later limiting waived claims to those "which exist as of the date this Agreement is fully executed."  On their face, these provisions are irreconcilable.  Neither Wholesale's nor

12

APS's interpretation as to the Settlement Agreement's effect on Wholesale's claims are unreasonable.  In giving effect to the entire agreement and assuming that the parties intended both clauses to have some effect, as the Court must, the Court concludes that the Settlement Agreement is ambiguous as to whether Wholesale's conversion claims asserted in this case were released by the Settlement Agreement.  Consequently, summary judgment for either party is inappropriate at this time because a fact issue remains for the jury to resolve after evaluating the testimony of the witnesses with knowledge of the issues.

## V.   CONCLUSION

For the foregoing reasons, the Court will deny both motions for summary judgment.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE